# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ROSE R. JAMES, | ) |
| | ) |
|        **Plaintiff,** | ) |
| | ) |
|     v. | )   No. 04 C 8145 |
| | ) |
| ILLINOIS DEPARTMENT OF | ) |
| HUMAN SERVICES, | )   Judge Rebecca R. Pallmeyer |
| | ) |
| | ) |
|        **Defendant.** | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Rose James claims the Illinois Department of Human Services discriminated against her on the basis of her race, African-American, and retaliated against her for complaints of discrimination, when it disciplined and ultimately discharged her from her support service position at the W. A. Howe Developmental Center. Defendant has moved for summary judgment. For the reasons stated here, the motion is granted.

## FACTS[1]

Plaintiff was hired by the Illinois Department of Human Services on October 16, 1990. (Def.'s 56.1 ¶ 3, citing Affidavit of Robert Schneider, Exhibit D-1 to Def.'s 56.1.) She worked initially as a Support Service Worker and, after June 2000, as a Support Service Lead in the Dietary section of the W. A. Howe Developmental Center ("Howe Center"). (Def.'s 56.1 ¶¶ 4,5, citing Deposition of Rose James, Exhibit C to Def.'s 56.1, at 18-19, 20.) The Howe Center is a 24-hour transition facility for approximately 500 developmentally disabled adults. (Def.'s 56.1 ¶ 6, citing Schneider Aff. ¶ 2.) As a lead worker, Plaintiff was responsible for supervising support service

---

[1] Facts presented here are taken from the parties' Local Rule 56.1 statements and attachments. Defendant's Local Rule 56.1 Statement of Material Facts in Support of Defendant's Motion for Summary Judgment is cited here as "Def.'s 56.1." Plaintiff's Response to Defendant's Statement of Material Facts and Statement of Additional Material Facts is cited here as "Pltf.'s 56.1 Resp." and "Pltf.'s 56.1 Add'l." Defendant's Response to Plaintiff's Statement of Additional Material Facts is cited here as "Def.'s 56.1 Resp."

workers in the tray line, "warewash" operations, and portioning of food. (Def.'s 56.1 ¶ 4, citing James Dep. at 18-19.)

**<u>Disciplinary Practices</u>**

Guidelines concerning the rights and responsibilities of Howe Center employees and managers are set forth in the Employee Handbook and the union agreement; Robert Schneider, the Director of Nutrition Management, testified that new employees are expected to familiarize themselves with the policies and procedures at the Howe Center by reviewing the Handbook and the union agreement. (Def.'s 56.1 ¶ 11, citing Deposition of Christine Hammond, Exhibit E to Def.'s 56.1, at 14-15; Pltf.'s 56.1 Add'l ¶ 6, citing Deposition of Robert Schneider, Exhibit D to Def.'s 56.1.) In addition, Vieddia Jackson (another Service Support Lead worker) testified that there are certain "unwritten rules," though she did not offer any specific examples, and Dietary Manager Michael Jankowski confirmed that "[n]ot every instance in every situation is covered in the Employee Handbook." (Deposition of Vieddia Jackson, Exhibit B to Pltf.'s 56.1 Add'l, at 9-10; Deposition of Michael Jankowski, Exhibit G to Def.'s 56.1, at 8.) Defendant has a "zero-tolerance" policy for violence and considers a threat of physical harm to constitute "violence." (Pltf.'s 56.1 Add'l ¶ 10, 11, citing Jackson Dep. at 10-11, 13; Deposition of Mark Connell, Exhibit F to Def.'s 56.1 at 12-13; Schneider Dep. at 14; Hammond Dep. at 13.) Employees who exhibit violent behavior are assigned to an "anger management program." (Pltf.'s 56.1 Add'l ¶ 12, citing Hammond Dep. at 18.)

Dietary Manager Michael Jankowski testified that managers' ability to distinguish certain types of misconduct has improved over time. (Jankowski Dep. at 21.) The parties agree that decisions about whether an employee should be disciplined, and what type of discipline is appropriate, depends on the nature of the violation and the employee's disciplinary history. (Def.'s 56.1 ¶ 12, citing Schneider Aff. ¶ 9; Affidavit of Christine Hammond, Exhibit E-1 to Def.'s 56.1, ¶ 9; *see also* Deposition of Lois Wengelewski, Exhibit H to Def.'s 56.1, at 49 (managers would consider "the way [a] verbal threat was made or the context" in determining what discipline is appropriate).

Discipline is ordinarily progressive, except that where an employee has been disciplined once but has gone several years without further discipline, a disciplinary infraction might be treated less severely. (Def.'s 56.1 ¶ 14, citing Wengelewski Dep. at 47.)

Dietary Managers--including, during Plaintiff's employment, Christine Hammond, Michael Jankowski, Lois Wengelewski, and Mark Connell--reported to Robert Schneider, the Director of the Nutrition Management Department, and were responsible for scheduling and supervising workers, keeping time records, conducting evaluations, and answering the phone. (Def.'s 56.1 ¶¶ 7-9, citing Schneider Aff. ¶¶ 3, 5, and Connell Dep. at 8.) Dietary Managers also made recommendations with respect to discipline, but the ultimate decision regarding whether and how severely an employee should be disciplined was made by Schneider, in consultation with the Department of Human Resources. (Def.'s 56.1 ¶¶ 13, 16, citing Schneider Aff. ¶¶ 6-17, Jankowski Dep., at 6-7, 51, Hammond Aff. ¶ 7.) Jankowski testified that "horse trading," or negotiations between the workers' union and managers, could result in an adjustment to a disciplinary measure. (Jankowski Dep. at 36.)[2]

Before an employee is disciplined, he or she is given a notice and entitled to a pre-disciplinary meeting. Based on information presented at the meeting, a decision is made about whether to proceed with discipline. (Def.'s 56.1 ¶ 15, citing Hammond Aff. ¶ 6.)

---

[2] Defendant objects to this characterization of the union's influence in disciplinary decisions, (Def.'s 56.1 Resp. ¶ 8), but it is undisputed that in many instances in this record, the discipline imposed on an employee was reduced from a more severe sanction after union intervention. Plaintiff has not named the union as a defendant nor suggested that it was the union rather than Defendant who discriminated against her. Nor has Defendant suggested that any alleged unfairness in Plaintiff's discipline was a function of union interference. Accordingly, in this opinion the court refers only to the discipline imposed after any reductions resulting from the union's efforts, not to the often-more-severe discipline initially imposed by management.

**Plaintiff's Disciplinary History**[3]

Each of Plaintiff's annual performance evaluations from 1992 through 2002 reflected concerns regarding "human relations" issues, including "personal problems" with co-workers and managers and with "taking and giving orders."  Plaintiff was counseled to "chang[e] her approach to one of non-confrontation," to "stay[] focused on her work and not worry about what her peers and co-workers are doing," was warned that her behavior was "not acceptable," and was repeatedly marked as "need[ing] improvement" in "human relations."  (Def.'s 56.1 ¶¶ 17-23, citing Appendix 1 to James Dep., Bates Numbers 149-207.)

Plaintiff's interpersonal difficulties resulted in discipline on several occasions.  In March 1994, she received a five-day suspension for "unbecoming conduct" after she reportedly asked another worker, "Who the f— are you . . . You want to whip my ass?"  At about the same time, Plaintiff said she wanted to bring a gun to work and shoot a co-worker, Brenita Hughes.  (Def.'s 56.1 ¶ 24, citing James Dep. at 59-61; 3/24/94 disciplinary notice, Appendix 3 to James Dep.) Dietary Manager Lois Wengelewski conducted a "management discussion" with Plaintiff on August 2, 1995, to discuss disruptive comments Plaintiff had made: "These white people do what they want," and "White people are nasty."  (Def.'s 56.1 ¶ 26, citing James Dep. at 140-41, Appendix 2 to James Dep., Bates Number 2254, Schneider Aff. ¶ 14.)  Two months later, Ms. Wengelewski again counseled Plaintiff about "respect and interaction with other people."  (Def.'s 56.1 ¶ 27, citing James Dep. at 141-42, Appendix 2 to James Dep., Bates Number 2255.)

Beginning in 1997, Plaintiff received disciplinary suspensions of increasing length.  In February 1997, she received a six-day suspension when she became argumentative and loud in refusing a work assignment; Plaintiff denies the alleged misconduct, but acknowledges that she

---

[3] Defendant objects to the court's consideration of any claim that pre-dates the filing of Plaintiff's EEOC charge by more than 300 days.  Plaintiff argues that the "continuing violations" doctrine supports consideration of her entire disciplinary record, but she does not seek relief for any adverse action other than her discharge, and both parties appear to agree that earlier discipline is relevant to her claim that her discharge was a product of race discrimination and retaliation.

was disciplined. (Pltf.'s 56.1 Response ¶ 28; James Dep. at 69-70, 73.)[4] In June 1997, Plaintiff received a ten-day suspension after a co-worker reported hearing Plaintiff make derogatory comments about the co-worker, her husband, and other employees. (Def.'s 56.1 ¶ 29, citing James Dep. at 74-75, Appendix 5 to James Dep.) Plaintiff denies the misconduct, but acknowledges the co-worker's report resulted in the discipline. (Pltf.'s 56.1 Resp. ¶ 29, citing James Dep. at 78-80.) In May 1998, Plaintiff received a 12-day disciplinary suspension for unbecoming conduct. (Def.'s 56.1 ¶ 31.)[5] Plaintiff denies having engaged in any such misconduct. (Pltf.'s 56.1 Resp. ¶ 31, citing James Dep. at 87-88.) In May 2000, Plaintiff was suspended for 12 days after an incident in the ladies room with a co-worker in which she was accused of instigating a "loud, shouting, profanity-ridden incident." (Def.'s 56.1 ¶ 32, citing Appendix 7 to James Dep.) Plaintiff acknowledges this was the stated reason for her suspension, but denies that she was responsible for the profanity. (Pltf.'s 56.1 Resp. ¶ 32, James Dep. at 98-102.) She notes, further, that the co-worker involved in the incident, also an African-American, told Plaintiff she would "put her foot in [Plaintiff's] ass," but was apparently not disciplined. (Pltf.'s 56.1 Add'l ¶ 17, citing James Dep. at 96-100.)[6] Three months later, in August 2000, Plaintiff was again suspended, this time for 18 days, after she allegedly shook her finger in the face of a Dietary Manager, yelled at him, left her work area without

---

[4] The court notes that Plaintiff's own testimony, and Robert Schneider's summary affidavit, are the only documentary evidence of this February 1997 discipline. Defendant cites Appendix 5 to Plaintiff's deposition, but that appendix includes disciplinary action forms dated June 1997 and July 1997 (not February 1997), and a one-page summary of disciplinary measures that makes no mention of a February 1997 suspension.

[5] Defendant asserts the suspension was imposed for "inappropriate, profanity-ridden . . . and threatening comments" to other workers. (Def.'s 56.1 ¶ 31.) The document cited, however, a summary disciplinary notice, refers to an attached page that purportedly describes the misconduct in detail, but no copy of that document appears in the record. (*See* Appendix 6 to James Dep.)

[6] Defendant objects to this assertion based on hearsay. (Def.'s 56.1 Resp. ¶ 17.) Indeed, Plaintiff's only evidence in support of her claim that the co-worker was not disciplined is Plaintiff's own testimony that the co-worker "did not receive anything for the simple reason because management said that that was her first time, her first altercation or incident or something." (James Dep. at 100.) The court notes, however, that Defendant, the party with access to the relevant records, offers no evidence to the contrary.

authorization, and later abandoned an overtime assignment without authorization. (Def.'s 56.1 ¶ 33, citing James Dep. at 112-14, Appendix 8 to James Dep.) Plaintiff acknowledges these reasons were given for her discipline, but again denies any wrongdoing. (Pltf.'s 56.1 Resp. ¶ 33, citing James Dep. at 108-09, 118-19.) In October 2001, Plaintiff was suspended for 30 days for argumentative and insubordinate comments to co-workers and supervisors. (Def.'s 56.1 ¶ 34, citing James Dep. at 128-29, 131, 132-33, Appendix 9 to James Dep.) Although Plaintiff purports to deny these charges, (Pltf.'s 56.1 Resp. ¶ 34), she in fact acknowledges having used certain expressions cited in the disciplinary notice: She told co-worker Vieddia Jackson, "I'm 47 years old, my momma is dead and my daddy don't work here in the tray line." (James Dep. at 131.) When Dietary Manager Lois Wengelewski spoke to her about a need for margarine on the serving line, Plaintiff told Ms. Wengelewski to go back to her office and mind her own business because "stores was her [Plaintiff's] business." (*Id.* at 132-33.)

**Plaintiff's Disputes with Brenita Hughes**

Plaintiff complained on repeated occasions that Brenita Hughes was harassing her. (Schneider Dep. at 16-18, 20, 23, 35, noting complaints concerning incidents in 1992, 1994, 1995, and 1997.) For example, in October 1992, Plaintiff reported an incident in which Hughes verbally abused and threatened her, followed Plaintiff in her car and continued to harass her for several blocks, made threatening phone calls to Plaintiff at home, threatened Plaintiff's unborn child and told Plaintiff's daughter "she gonna kill her." (Pltf.'s 56.1 Add'l ¶ 19, citing Appendix 5 to Peden Dep.) Management considered Hughes's behavior a threat of physical violence, (Pltf.'s 56.1 Add'l ¶ 20, citing Jankowski Dep. at 26), and Christine Hammond testified that the incident resulted in a five-day suspension. (Hammond Dep. at 30-31.) Plaintiff wrote a second complaint concerning Hughes on January 9, 1993, and a third on January 25, 1993, but both of these are date-stamped as having been received by management on May 15, 1997, and there is no evidence that Plaintiff submitted them earlier. (Appendix 10 to Schneider Dep.) Neither party explains whether Hughes

was disciplined for her conduct in these then-four-year-old incidents.

Plaintiff asserts that on March 4, 1998, Hughes "repeatedly and unnecessarily bumped Plaintiff on the tray line." (Pltf.'s 56.1 Add'l ¶ 23.) The court was unable to locate the pages she cites for this assertion in the record, but it is undisputed that the union filed a grievance on Plaintiff's behalf on March 12, 1998 that contains the words "sexual harassment," and that requests, as relief, "that management protect Ms. James rights, stop practice and all be made whole." (Appendix 11 to Schneider Dep.) Neither party explains the outcome of the grievance or states whether discipline resulted.

On August 20, 2002, Plaintiff filed a written report in which she complained that Brenita Hughes had made insulting comments about her in the presence of several other employees, including the words, "what man you was out all night with." (Appendix 5 to Wengelewski Dep.) Plaintiff characterized the situation as one "that could lead to work place violence." (*Id.*) Donald Franklin filed a written report on September 16, 2002 in which he observed that Ms. Hughes "told Rose James . . . that was the ugliest wig she ever saw" and "that her dress looked like drapes, and that she had real skinny legs." (Appendix 1 to Deposition of Donald Franklin, Ex. C to Pltf's 56.1.) Franklin wrote that it appeared to him that Ms. Hughes was "playing" with Plaintiff. (*Id.*) He testified, "It was a joke," but recalled that Plaintiff "didn't take it very well." (Franklin Dep. at 8.) A Disciplinary Action Form indicates Ms. Hughes received a five-day suspension as a result of this incident. (Appendix 5 to Wengelewski Dep.)

On August 25, 2003, Ms. Hughes instructed another worker to serve salad that was outdated and received an oral reprimand as a result. (Appendix 15 to Hammond Dep.) Several months later, a similar incident occurred. In March 2004, Plaintiff expressed concern that Ms. Hughes was putting inappropriate food on the tray in an effort to get Plaintiff in trouble. (Deposition of EEO Officer Roger Peden, Exhibit 1 to Def.'s 56.1, at 61-62.) She told EEO Officer Roger Peden that this had happened before and "nothing was done." In a March 18, 2004 e-mail message,

7

Peden asked Dietary Manager Christine Hammond about the incident, and Ms. Hammond explained that Plaintiff had called the Inspector General hotline "reporting an issue regarding Brenita." (E-mail messages, Appendix 11 to Peden Dep.) Ms. Hammond noted that both Plaintiff and Ms. Hughes had been "submitting statements about each other consistantly (sic)," and "it's not a healthy situation." (*Id.*) Ms. Hammond observed that other employees had also complained about Ms. Hughes's disruptive behavior. (*Id.*) Vieddia Jackson testified that Hughes had attempted to "set [Jackson] up" by putting stolen food in Jackson's desk drawer and that Hughes was "going after" Plaintiff and other co-workers verbally, as well. (Pltf.'s 56.1 Add'l ¶¶ 32, 33, citing Jackson Dep. at 21-27.)

On March 22, 2004, Ms. Hammond again e-mailed Mr. Peden about the matter, this time reporting that Plaintiff had submitted a statement that Ms. Hughes had placed a "wrong food item" on the tray of an individual with complicated dietary needs. (E-mail messages, Appendix 11 to Peden Dep.) Donald Franklin had "caught the mistake as it was happening." He concluded it "was not intentional by Brenita." (*Id.*) Ms. Hammond noted that both Ms. Hughes and Vieddia Jackson had received additional training. (*Id.*) Mr. Peden responded by asking whether Ms. Hughes had "performed this same act to [Plaintiff] in the past," and when Ms. Hammond responded, "[n]ot that I recall," Mr. Peden urged her to check whether there were records of any past incidents. (*Id.*)[7]

**Events Leading to Discharge**

The final discipline imposed on Plaintiff resulted from two incidents in early 2004. First, in January, Support Service Worker Darlene Hampton complained to Dietary Manager Christine Hammond that Plaintiff had called Ms. Hampton a "big nasty ass" and "fat whore," and had made comments about sexual activities between Hampton and a male co-worker. (Def's 56.1 ¶ 41, citing

---

[7] Plaintiff asserts that the investigation into this incident supported the conclusion that there had been a violation of the workplace violence policy, (Pltf.'s 56.1 Add'l ¶ 28), but it is clear from the document she cites that the workplace violence reference related to the dispute between Plaintiff and Jacqueline Armstrong in April 2004, not to the March 2004 Hughes/mistaken food matter. (*See* Appendix 10 to Peden Dep.)

Peden Dep. at 58-59.) Following an investigation that included interviews with several employees, the Howe Center EEO officer concluded in April 2004 that Plaintiff had violated the Howe Center's sexual harassment and employee conduct policies. (Def.'s 56.1 ¶¶ 36-41, citing James Dep. at 197-99, 203; Hammond Aff. ¶¶ 10, 12, 14, 15; Peden. Dep. at 58-59.)

Then, on April 25, 2004, Plaintiff became involved in an altercation with Jacqueline Armstrong, a co-worker, in which each used profanity. Both Plaintiff and Armstrong returned to work. Although Armstrong had told Plaintiff that she was going to "kick [Plaintiff's] ass," (Pltf.'s 56.1 Add'l ¶ 43, Affidavit of Jacqueline Armstrong, Exhibit L to Def.'s 56.1, ¶ 6), Dietary Manager Christine Hammond did not perceive the situation as involving any real or threatened violence; she nevertheless conducted an investigation, interviewing several witnesses, and concluded that Plaintiff, who was at that time assigned to act as "Coordinator," had done nothing to diffuse the altercation. (Def.'s 56.1 ¶¶ 42-47, citing Hammond Aff. ¶¶ 18-21; James Dep. at 214-21.)[8] Armstrong, who had previously been disciplined only for attendance violations, received a 15-day suspension. (Def.'s 56.1 ¶ 78; Pltf.'s 56.1 Add'l ¶ 45; Armstrong Aff. ¶ 11; Wengelewski Dep. at 20-21.) Explaining why the discipline imposed on Ms. Armstrong was not more severe, Lois Wengelewski testified that "Jackie had very few incidents the whole time she has worked here . . . [s]o when she said this . . . we felt that maybe it was just one of those days and she wasn't really–didn't really mean it. She just was having a rough day working." (Pltf.'s 56.1 Add'l ¶ 46, citing Wengelewski Dep. at 22.) Consistent with the Howe Center's progressive discipline policy, Plaintiff, who had already received a 30-day suspension, was notified of a 30-day suspension pending discharge. (Schneider Aff. ¶ 24; Hammond Aff. ¶ 23.) It is undisputed that this incident did not immediately come to the attention of the Howe Center EEO Officer, Roger Peden, or the

---

[8] Plaintiff asserts that Ms. Armstrong "made threats of physical harm and obscenities, which Plaintiff did not," (Pltf.'s 56.1 Add'l ¶ 44, citing Jackson Dep. at 31; Appendix 3 to Jackson Dep.), but, although the incident report attached as Appendix 3 makes no reference to threats on Plaintiff's part, it does recount Plaintiff's statement, "You ain't gonna do shit to me." *See also* Armstrong Aff. ¶ 6 ("I was very angry when I told Ms. James that I was going to 'kick her ass.' She replied that I wasn't going to do 'shit' to her.")

Workplace Violence Coordinator, Kenneth McCaffrey. (Pltf.'s 56.1 Add'l ¶¶ 13, 47, citing Peden Dep. at 48-49.) When he later saw information concerning the investigation of the incident, McCaffrey expressed concern that Ms. Armstrong's conduct appeared to violate the workplace violence policy. (Pltf.'s 56.1 Add'l ¶¶ 30, 47, citing Appendix 10 to Peden Dep.)

**Plaintiff's Complaints of Discrimination**

In April or May 1997, Plaintiff submitted to Robert Schneider several handwritten statements in which she alleged that co-worker Brenita Hughes had harassed her on dates between 1992 and 1995. (Def.'s 56.1 ¶ 49, citing James Dep. at 151-55; Schneider Aff. ¶ 34.) She filed a union grievance of sexual harassment by Ms. Hughes in 1998, but that grievance was denied. (Def.'s 56.1 ¶¶ 50, 51, citing James Dep. at 158-62.) Plaintiff filed an EEOC charge in April 2000, alleging she had been denied a promotion to a Support Service Lead position on the basis of her race. (Def.'s 56.1 ¶ 52, citing James Dep. at 172-73; EEOC Charge, Appendix 11 to James Dep.) After a successful grievance related to the same matter, Plaintiff and a co-worker were awarded the Lead position, and Plaintiff withdrew the EEOC charge. (Def. 56.1 ¶¶ 54-55; James Dep. at 176-78; Schneider Aff. ¶¶ 28, 29.) Plaintiff filed a second EEOC charge in April 2001, alleging that her 18-day suspension was a product of race discrimination and retaliation. (Def.'s 56.1 ¶ 56, citing James Dep. at 181, 4/30/01 EEOC charge, Appendix 12 to James Dep.) Roger Peden, the Howe Center EEO officer, concluded that Plaintiff had received harsher discipline for leaving work early than co-worker Mary Dusik because Plaintiff had a longer disciplinary history than did Ms. Dusik. (Def.'s 56.1 ¶¶ 57, 58, citing Peden Dep. at 19-20, 33.) Plaintiff filed an internal complaint of discrimination in March 2003, alleging that Mary Dusik had been treated more favorably with respect to discipline, but she acknowledges that her own more extensive disciplinary record could account for the differences in treatment. (Def.'s 56.1 ¶¶ 59, 60, citing James Dep. at 186, 196; Appendix 16 to James Dep.) On June 16, 2003, Plaintiff filed a charge of sexual harassment with the EEOC. That charge was dismissed by the EEOC three months later. (Def.'s 56. 1 ¶ 61, citing James Dep. at

163-64; Appendix 15 to James Dep.)  Plaintiff acknowledges that none of her supervisors ever made any "racial remarks" to her or told her that any discipline had been imposed on her because of her race or because she had filed charges of discrimination. (Def.'s 56.1 ¶ 62, citing James Dep. at 253-54.)

**Discipline Imposed on Co-Workers**

Plaintiff compares her disciplinary history with the discipline imposed on three of her co-workers: Brenita Hughes, Mary Dusik, and Jacqueline Armstrong.[9]

Brenita Hughes, an African-American, is a 20-year employee of the Howe Center, most recently in the position of Support Service Coordinator. (Def.'s 56.1 ¶ 63, citing Deposition of Brenita Hughes, Exhibit J to Def.'s 56.1, at 5-6.)  Ms. Hughes received a two-day suspension in January 1988 for refusing a direct order; a three-day suspension in 1990 for using profanity in the presence of a supervisor and co-worker; and two five-day suspensions, one in November 1992 and another in 2002, both for making inappropriate remarks to Plaintiff. (Def.'s 56.1 ¶¶ 64-66, 68, citing Schneider Aff., ¶¶ 31-32, 36.)  In addition to these suspensions, Ms. Hughes was subject to a "Management Discussion," in October 1995, as Plaintiff was, on "respect and interaction with people" and, in April 2004, a written reprimand for disrupting the work site and arguing with a Service Support Coordinator. (Def.'s 56.1 ¶¶ 67, 69, citing Schneider Aff. ¶¶ 33.)

Mary Dusik, a Caucasian, began working at the Howe Center in December 1991 and is currently employed as a Support Service Lead. (Def.'s 56.1 ¶ 70, citing Deposition of Mary Dusik, Exhibit K to Def.'s 56.1, at 6-7.)  Ms. Dusik received a one-day suspension for making

---

[9] Defendant denies that Plaintiff, a Service Support Lead, had the same job as Hughes, a Service Support Coordinator (Def.'s 56.1 Resp. ¶ 2, citing Hughes Dep. at 6), but the page Defendant cites from Ms. Hughes' deposition is not in the record, nor is the court aware whether a Service Support Coordinator is of higher or lower rank than Service Support Lead. In portions of its summary judgment submissions, Defendant itself refers to Plaintiff's role as "Coordinator." *See* Def. 56.1 ¶ 47, citing Hammond Dep. ¶ 21. For purposes of this decision, Plaintiff's assertion that she had the same job and same supervisors as Hughes, Armstrong and Dusik (Pltf.'s 56.1 Add'l ¶ 2) is deemed admitted.

inappropriate remarks to a supervisor and failing to follow a directive in June 1995; a one-day suspension for failure to follow instructions and loud, inappropriate statements in August 1997; and a six-day suspension in November 1997 for unbecoming conduct (including patting Director of Nutrition Management Robert Schneider four times on his shoulder with an open hand), disruption of the work site and failure to follow supervisory direction. (Def.'s 56. 1 ¶¶ 72-74; Pltf.'s 56.1 Add'l. ¶ 37; 9/10/97 memo, Appendix 6 to Hammond Dep.) Ms. Dusik also received a "Management Counseling" in November 2002 for calling a supervisor a "racist," and telling a co-worker to "kiss [her] butt"[10] and a "Management Discussion" in April 2003 in which Dietary Manager Lois Wengelewski reminded Dusik to defer problems and conflicts to a supervisor rather than engaging co-workers in a dispute. (Def.'s 56.1 ¶¶ 75-76, citing Schneider Aff. ¶ 42.) Ms. Dusik made complaints about sex and race discrimination at the Howe Center but does not believe those complaints resulted in any retaliation. (Def.'s 56.1 ¶ 71, citing Dusik Dep. at 6-7, 58; Pltf.'s 56.1 Add'l ¶ 34.) In 2002, an African-American worker, Ed Harris, complained of race discrimination when Ms. Dusik received a temporary management assignment to which Harris believed he was entitled. (Pltf.'s 56.1 Add'l ¶ 16, citing Appendix 1 to Deposition of Ed Harris, Exhibit D to Pltf.'s 56.1)[11]

Jacqueline Armstrong, an African-American, worked as a Support Service Lead between 1998 and June 30, 2005. (Def.'s 56.1 ¶ 77, citing Armstrong Aff., ¶ 1-2.) She received a 15-day suspension for her role in the April 2004 altercation with Plaintiff. Plaintiff admits that the decision

---

[10] Plaintiff asserts that, in addition, Ms. Dusik refused to go to the office when requested by her supervisor, but the court is unable to find evidence of this misconduct in the pages Plaintiff cites. (Pltf.'s 56.1 Resp. ¶ 75, citing Appendix 6 to Peden Dep.)

[11] Defendant denies that Harris complained of race discrimination, but Harris's written statement asserts, "I am charging raceism (sic)," and makes reference to Ms. Dusik, who he claimed had been treated more favorably, as a "white American." (Appendix 1 to Harris Dep.) Plaintiff asserts that Harris testified that Plaintiff had "succeeded in prosecuting a racial discrimination claim by going to the EEOC," (Pltf.'s 56.1 Add'l ¶ 16), but in the relevant testimony, Harris said only that "management reversed its position" about promoting Plaintiff to the position of lead worker after Plaintiff "complained to the EEOC." He acknowledged that "[w]hat led to her getting the position, [he] was not aware of." (Harris Dep., at 24-25.)

to give Ms. Armstrong less-severe discipline was based in part on the fact that she had no prior discipline for any conduct other than attendance violations. (Def.'s 56.1 ¶¶ 79-80, citing Hammond Aff. ¶ 22, Schneider Aff. ¶ 25; Armstrong Aff. ¶ 11.)

The record also includes certain other incidents relating to employee discipline. Mary Dusik recalled that in 2004, two employees were involved in an altercation in which one who pushed the other was fired. (Pltf.'s 56.1 Add'l ¶ 14, citing Dusik Dep. at 11-12.) Service Support Lead Worker Donald Franklin testified that a co-worker threatened to "kick [his] ass"; he reported this to management and the co-worker was fired immediately. (Pltf.'s 56.1 Add'l ¶ 15, citing Franklin Dep. at 9.)

**Plaintiff's Claims**

On June 14, 2004, Plaintiff filed a charge of race discrimination and retaliation with the EEOC. She alleged that Defendant had suspended her pending discharge allegedly for "unbecoming conduct" and the use of profanity, while a non-black employee guilty of similar misconduct and use of profanity was not. (EEOC Charge, Exhibit B to Def.'s 56.1; James Dep. at 234-35.) This lawsuit followed.

**DISCUSSION**

Defendant has moved for summary judgment, arguing that the undisputed facts establish that it was Plaintiff's disciplinary record, not her race or her complaints about discrimination, that resulted in her discharge in June 2004. Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The court construes the facts and draws all reasonable inferences in the light most favorable to the party opposing summary judgment. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The court is not, however, required to "'draw every conceivable inference from the

record,'" and inferences supported only by "speculation or conjecture will not defeat a summary judgment motion." *Bell v. Duperrault*, 367 F.3d 703, 707 (7th Cir. 2004) (quoting *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003)).

**I.      Race Discrimination**

The standards for proving race discrimination are familiar. To establish such a claim in response to a motion summary judgment, a plaintiff may proceed under either the "direct" or the "indirect" (burden-shifting) method. *See Thanongsinh v. Bd. of Educ.*, 462 F.3d 762, 772 (7th Cir. 2006). Under the direct method, a plaintiff offers either direct or circumstantial evidence of discriminatory intent. *Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 812 (7th Cir. 2007) (citing *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005)). "'Direct evidence is evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption.'" *Rudin*, 420 F.3d at 720 (quoting *Eiland v. Trinity Hosp.*, 150 F.3d 747, 751 (7th Cir. 1998)). In an employment case, direct evidence "essentially requires an admission" by the employer that an employment decision was based on an unlawful animus. *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003).

Alternatively, a plaintiff can survive summary judgment by presenting circumstantial evidence "from which a rational trier of fact could reasonably infer that the defendant [acted] because the [plaintiff] was a member of a protected class." *Phelan v. Cook County*, 463 F.3d 773, 780 (7th Cir. 2006) (internal quotations and citation omitted). Circumstantial evidence is that which "allows the trier of fact 'to infer intentional discrimination by the decisionmaker.'" *Rudin*, 420 F.3d at 720 (quoting *Rogers*, 320 F.3d at 753). The Court of Appeals has recognized three types of circumstantial evidence: suspicious statements or behavior, evidence of other employees receiving systematically better treatment, and evidence that a person qualified for a position or a promotion was passed over by someone else for a stated reason that is unworthy of belief, or pretextual. *See Troupe v. May Dep't Stores*, 20 F.3d 734, 737 (7th Cir. 1994). More recently, the Court of Appeals

14

has explained that this last form of circumstantial evidence (the disparate treatment of similarly situated employees) is the same kind of evidence necessary to establish discrimination under the "indirect method." *Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1052 (7th Cir. 2006)

Under that familiar method, a plaintiff can establish a prima facie case of discrimination by showing that (1) she is a member of a protected class; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) other similarly situated employees who were not members of the class were treated more favorably. *Rozskowiak v. Vill. of Arlington Heights*, 415 F.3d 608, 614 (7th Cir. 2005) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Where, as in this case, the plaintiff contends she was disciplined for some prohibited reason, the Seventh Circuit requires her to show that she is similarly situated with respect to her performance, qualifications, and conduct, to the individual(s) she contends received more favorable treatment. *Snipes v. Ill. Dep't of Corr.*, 291 F.3d 460, 463 (7th Cir. 2002). If the plaintiff establishes a prima facie case, the defendant can rebut it by articulating a legitimate, non-discriminatory reason for the adverse employment decision. *Sun*, 473 F.3d at 814; *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005). To overcome that showing, the plaintiff must prove that the defendant's explanation was a pretext for discrimination. *Sun*, 473 F.3d at 814. Proving pretext "requires more than showing that the decision was 'mistaken, ill considered or foolish, [and] so long as [the employer] honestly believes those reasons, pretext has not been shown.'" *Ballance*, 424 F.3d at 617 (quoting *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000)). Unless the plaintiff sets forth specific evidence showing that the employer itself did not believe the proffered reasons for the employment action, the plaintiff cannot survive summary judgment. *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 754-55 (7th Cir. 2006).

Plaintiff is unable to defeat summary judgment under these standards. First, she acknowledges that there is no direct evidence of race discrimination here. (James Dep. at 253-54.) She has suggested that the record contains circumstantial evidence of discrimination, but

15

characterizes that evidence as "a consistent pattern of treating Plaintiff less favorably than other [similarly] situated workers." (Plaintiff's Response to Motion for Summary Judgment, at 9, 10.) Nothing in the circumstances here suggests that race was the motivation for the favoritism Plaintiff claims was accorded to other workers, however.

Nor can she raise an inference of discrimination under the indirect, or "burden-shifting" method of proof: Of the three individuals to whom she compares herself, two of them (Brenita Hughes and Jacqueline Armstrong) are, like Plaintiff, African-Americans. Mary Dusik is white, but she received no more favorable treatment than Plaintiff did. In June 1995, August 1997, and November 1997, Ms. Dusik received disciplinary suspensions for "conduct unbecoming," including a one-day suspension for inappropriate remarks to a supervisor and failing to follow a directive (June 1995); another one-day suspension for failure to follow instructions and making loud, inappropriate statements (August 1997); and a six-day suspension for disrupting the workplace and failure to follow supervisory direction (November 1997). There were no further incidents until November 2002, when Ms. Dusik received a "management counseling" for calling a supervisor a "racist" and telling a co-worker to "kiss [her] butt," and then another "management discussion" in April 2003, in which she was reminded to refer workplace disputes to a supervisor.

Plaintiff, in contrast, received a five-day suspension in 1994, a "management discussion" in August and October 1995, and then beginning in 1997, a six-day suspension (February 1997), a ten-day suspension (June 1997), two 12-day suspensions (May 1998 and May 2000), an 18-day suspension (August 2000), and a 30-day suspension (October 2001). She had another "management discussion" in April 2003, and was finally suspended pending termination after sexually derogatory remarks to a co-worker and a loud, profane dispute with a subordinate in early 2004. Plaintiff believes that some of the discipline was unjustified, but there is no evidence that her managers did not genuinely believe she was guilty of the misconduct for which it was imposed. Defendant is correct that in light of Plaintiff's extensive disciplinary history, Ms. Dusik cannot be

16

considered to be similarly situated. See *Greer v. Amesqua,* 212 F.3d 358, 370 (7th Cir. 2000) (employees who lack similar disciplinary history are not similarly situated).

Most significantly, Mary Dusik was not involved in the incidents in 2004 that led to Plaintiff's discharge. There is, thus, no basis from which the court can conclude that a decision-maker's discriminatory animus motivated any difference between Plaintiff's treatment and that of Ms. Dusik. Plaintiff has suggested that Defendant's adherence to the progressive discipline policy was "erratic and open to individual interpretation" and that "subjective factors" inevitably "play[ed] a "larger role." (Plaintiff's Response to Motion for Summary Judgment, at 4.) She compares the discipline she received for an incident in 2001, after she had already received five disciplinary suspensions, with what she perceives as a similar incident of misconduct on the part of Mary Dusik in 1997. Plaintiff contends that management explanations for the difference in treatment of these two incidents, separated by four years, illustrate the "snow-balling effect of a hostile work environment." (*Id.* at 6.) This court sees no indication in this record of any meaningful departure from Defendant's progressive discipline policy, despite the intervention, in many instances, of the union. In short, there is no evidence that Defendant excused or minimized the misconduct of anybody with a disciplinary record as serious as Plaintiff's. In any event, where two of the three individuals allegedly treated more favorably than Plaintiff were, like Plaintiff, African-Americans, there is no basis for the conclusion that any greater severity in the discipline she received was a function of race.

**II.    Retaliation**

Plaintiff's claim of retaliation fails for similar reasons. Like race discrimination, a claim of retaliation in violation of Title VII can be proven either by the "direct method" or the "indirect method." *Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 902 (7th Cir. 2006). As with respect to her race discrimination claim, Plaintiff has acknowledged that this is not the unusual case where there is evidence that establishes "without resort to inferences from circumstantial evidence[]

that [s]he engaged in protected activity (filing a charge of discrimination) and *as a result* suffered the adverse employment action of which [s]he complains." *Id.* at 902 (citing *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002).

Instead, she argues that an inference of retaliation arises from the fact that she was the only employee at the Howe Center who filed a "successful" charge with the EEOC. Defendant objects to Plaintiff's assertion that her April 2000 charge was "successful" because it resulted in her being awarded the Support Service Lead position; according to Defendant, it was Plaintiff's union grievance, not her EEOC charge, that prompted Schneider to review the "bid grade scoring" and award Plaintiff the Lead worker assignment. Even drawing inferences in favor of Plaintiff on this issue, however, she has the burden of establishing that it was her "successful" EEOC charge in 2000 that resulted in her termination four years later. To do so, Plaintiff again argues that she was treated less favorably by management than other workers.

Jacqueline Armstrong was the co-worker involved in an altercation with Plaintiff in 2004. Ms. Armstrong's behavior appeared to violate Defendant's "zero-tolerance" policy. Plaintiff complains that managers chalked Ms. Armstrong's offense up to a "rough day," but the court notes that she did receive a 15-day suspension, despite no previous incidences of "conduct unbecoming." Plaintiff, who was Ms. Armstrong's supervisor and had a long disciplinary history, was terminated as a result; nothing about these circumstances supports the conclusion that this decision was motivated by EEOC charges rather than her conduct in 2004.

Mary Dusik was not involved in the 2004 episode at all. As explained earlier, any effort to establish an inference of unlawful motivation from her treatment is defeated by her less significant disciplinary history. Notably, Ms. Dusik herself had filed charges of discrimination and testified that she did not believe she had been treated less favorably as a result.

That leaves Plaintiff's arguments about the purported more favorable treatment of Brenita Hughes. The dispute between Plaintiff and Hughes was longstanding. Plaintiff devotes significant

attention to the evidence that in 1992, Hughes harassed Plaintiff at work, followed Plaintiff in her car, and made threats against Plaintiff and her family members. Management's response—a five day disciplinary suspension—was, in Plaintiff's view, unsatisfactory. However disappointing that response may have been, neither any discipline imposed on Plaintiff at that time nor Defendant's failure to take more vigorous action concerning Ms. Hughes could have been a function of retaliation: Plaintiff made internal complaints of harassment, but did not assert in those complaints that any rights protected by Title VII were violated. Her 1998 union grievance characterized Ms. Hughes' having "bumped" Plaintiff in line as "sexual harassment," and she filed charges of discrimination with EEOC in 2000, 2001, and 2003. But as Defendant notes, her documented difficulties with "human relations" and history of discipline began well before she ever complained of discrimination, and there was no change in the pattern of discipline after those charges were filed. *See Stutler v. Ill. Dep't of Corr.,* 263 F.3d 698, 705 (7th Cir. 2001) (no link to protected activity where employer's treatment of employee was consistent before and after the complaint was filed); *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 735 (7th Cir. 2001).

Nor has Plaintiff demonstrated that Hughes was treated more favorably for similar misconduct. She complains about Hughes' conduct in serving the wrong food to a Howe Center resident in 2004 and suggests it was an effort on Hughes' part to set Plaintiff up; that incident was investigated by managers, who concluded that the conduct was unintentional. In any event, Defendant's failure to discipline Hughes for conduct in which Plaintiff herself was not involved and received no discipline simply creates no inference of retaliation. Hughes did receive a second suspension in 2002 for her conduct involving Plaintiff and a written reprimand for an altercation with a co-worker in 2004. Even assuming that altercation was as serious as the one leading to Plaintiff's discharge, there are obvious differences between Hughes's disciplinary record and that of Plaintiff that justify the differences in treatment between the two.

## **CONCLUSION**

Plaintiff had a lengthy, uninterrupted track record of interpersonal difficulties. She was cited for this conduct in her performance evaluations, counseled and warned, and then was subject to disciplinary suspensions of increasing length. Her disputes with co-workers culminated in a shouting match with another Support Service worker. That worker, an African American who had not filed charges of discrimination, and had no previous discipline, received a lengthy suspension but was not discharged. Nothing about this record creates an inference of race discrimination or of retaliation. Defendant's motion for summary judgment (39) is granted. The motion to strike (56) is denied as moot.

ENTERED:

Dated: March 6, 2007

_____
REBECCA R. PALLMEYER
United States District Judge